(54 South. 877.)

No. 18,354.

WILLIAMS v. CONGREGATION MATER DOLOROSA et al.

(March 27, 1911.)

*(Syllabus by the Court.)*

CONTRACTS (§ 350*)—ARCHITECT'S SERVICES——EMPLOYMENT—PROOF.

A contract for the payment of money above $500 must be proved at least by one credible witness and other corroborating circumstances. Civ. Code, art. 2227.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 350.*]

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by C. Milo Williams against the Congregation Mater Dolorosa and another. Judgment for defendants, and plaintiff appeals. Affirmed.

M. M. Boatner, for appellant. Caffery, Quintero, Gidiere & Brumby, for appellees.

LAND, J. Plaintiff sued to recover $7,500 as compensation for his services as architect, in the matter of the construction of a church building, which was never erected.

The Congregation Mater Dolorosa is a religious corporation organized under the laws of the state of Louisiana. The other defendant is Rev. J. F. Prim, pastor of the said church, and secretary and treasurer of said corporation.

The petition alleges that during the month of November, 1902, the plaintiff was employed as architect by said corporation, acting through said Prim, who was authorized to that effect, to design a church building to be erected on ground belonging to said corporation in the city of New Orleans, to draw the plans thereof, to attend to the letting of contracts for the erection of the same, and to superintend the construction and completion thereof, and as a compensation for such services the said corporation agreed to pay the plaintiff 10 per cent. on the total cost of the work, estimated to be $75,000, which said agreement was oral, and the fact that it had been made was well known to, and the same was acquiesced in by, the members of the board of directors of said corporation.

The petition further alleges that the plaintiff immediately began the performance of his duties, and after frequent consultations with said pastor, secretary, and treasurer, and after frequent interviews and consultations with building contractors, and after visiting Chicago and Jackson, Miss., and aft-

er the expenditure of much professional labor and skill, continuing about the space of four years, he conceived and designed a church building of great beauty of form, well suited to the needs of said congregation, and planned in accordance with the instructions of said pastor, secretary, and treasurer, and that said plan was accepted by said pastor, secretary, and treasurer, who instructed plaintiff to proceed to the securing of bids from contractors and subcontractors for the erection of said building—all to the knowledge and with the acquiescence of the members of the board of directors and of the said congregation.

The petition further alleges that plaintiff had made nearly all his working drawings, and was almost ready to invite bids, when, on or about January 27, 1907, the said Prim, acting for said corporation, notified petitioner to stop work, and on or about February 6, 1907, informed him that said corporation had determined not to build its church according to his plans.

The petition further alleges that on or about January 27, 1907, the said corporation contracted with one Mr. Thomas Brune, an architect, to build a church on said ground according to his plans, thus actively violating its contract with the plaintiff.

The petition further alleges that, had the said contract been performed, the plaintiff would have earned a fee of $7,500, and that by said violation thereof he has been damaged in that sum.

In the alternative, the petition represents that plaintiff's said services were well worth said sum, and were knowingly received and availed of by said corporation, its directors, officers, and members.

Further, in the alternative, the petition shows that in the event it should be held that said corporation did not contract with the plaintiff, and did not receive and avail itself of his said services, then the petition avers that the same were rendered at the special instance and request of the said Prim, who agreed to pay the plaintiff for the performance thereof the said sum of $7,500, and that said services were well worth said amount.

The prayer was for judgment against the defendants in solido for the sum of $7,500, with legal interest from judicial demand, and costs.

The defendants, after pleading exceptions, which were overruled, answered by denying all and singular the allegations contained in the petition.

The case was tried on the merits, and there was judgment in favor of the defendants. The plaintiff has appealed.

As the plans were not used by the corporation, plaintiff's case rests on proof of the alleged verbal contract made in November, 1902.

The testimony is too voluminous for recapitulation. Plaintiff's story as to the contract is in substance as follows:

About 1902, Father Prim asked him to set to work preparing the plans for a new church on Carrolton avenue; the understanding being that the plaintiff should have the job without competition. Plaintiff subsequently entered upon the work with great zest, and from then on there was a series of interviews and conversations on the subject-matter between them. Father Prim was wrapped up head and soul in the project, and so was the plaintiff, who was a member of his church, and they were warm personal friends. In 1904 the plaintiff visited Chicago for the purpose of investigating the question of terra cotta, and while there hired another architect to draft a large colored sketch of the new church. Subsequently the plaintiff and Father Prim visited Jackson, Miss., to inspect a church building. "The plans were then in a fermenting state, you might say." Father Prim constantly held plaintiff out to

his friends as his architect, and referred contractors to him. At the suggestion of Father Prim, plaintiff addressed about 30 members of the congregation for the purpose of arousing more zeal in the congregation for the raising of money for the execution of the plans, and exhibited to them a perspective of the proposed building. Two photographs of this perspective were hung in the church, with contribution boxes beneath, and under each picture was written: "Rev. J. M. Prim, Pastor. C. Milo Williams, Architect." Father Prim granted to plaintiff the privilege of erecting a large sign on the proposed site, bearing a legend that the plaintiff was the architect of the church to be there erected. This sign remained on the site from about 1905 to February 20, 1907. At the request of Father Prim, a picture of the proposed church building, "C. Milo Williams, Architect," with descriptive matter prepared by plaintiff, was published in 1905 in a newspaper owned by Father Prim; and the same picture, with similar descriptive matter, was published in the Times-Democrat on January 21, 1907. Plaintiff, at the request of Father Prim, staked out the general outlines of the building according to the plans on the building site. In February, 1905, plaintiff informed Father Prim that the cost of the building would be about $65,000, including architect's fees. Later Father Prim told plaintiff that he could not raise enough money to build a church at such estimated cost, and inquired if the price could not be reduced. Plaintiff replied that he thought the cost could be reduced to about $40,000 or $45,000. On January 9, 1907, Father Prim told the plaintiff that the archbishop had instructed him to proceed on the original plan, without cutting the cost to the detriment of the building. Plaintiff thereupon started work to complete details and to prepare for specifications. It was agreed between him and Father Prim that everything necessary for the invitation of bids should be completed before the latter's departure for Europe. Previously, and also at that particular time, the plaintiff informed Father Prim that his fee would be the customary 10 per cent., but that he could expect a very liberal donation out of the fee to the church on the completion of the work. On January 27, 1907, Father Prim wrote plaintiff that he was obliged to stop further development of plans for the new church, and invited the plaintiff to call on him. Plaintiff called, and was informed by Father Prim that there was opposition to him, and suggested the calling of a meeting of the board of directors, so that plaintiff might be heard. Father Prim promised to call such meeting for January 29th, and subsequently for January 31st. Plaintiff was informed by Father Prim that neither of the proposed meetings were held. Father Prim did not inform the plaintiff that on January 27, 1907, he or the board had already made a contract with another architect. As a matter of fact, the meeting was held on January 29, 1907, as shown by the minutes, and no contract was made until said date.

Plaintiff in the course of his employment expended $360 in railroad fare, cost of preparing perspective views, and living expenses.

On cross-examination, plaintiff stated that his dealings were with Father Prim individually, and with no other member of the corporation, knew in a general way that the church was incorporated, knew that there was a board of directors, and believed that Father Prim was building the church for the congregation or parish; also that Father Prim was the one to be suited, the one to give orders, and the one for him to negotiate with.

Father Prim's story is substantially as follows: In 1898 he invited bids from architects for sketches for a new church. Plaintiff was one of the bidders. After the sketches were received and examined, the archbishop decided not to build at that time. In

1899 plaintiff was employed by Father Prim to remodel the old church building, performed the work, and was paid for his services. In 1901 the structure was enlarged by other architects. Both of these contracts were made by Father Prim, without any express authority from the board of directors and the archbishop, as required by the charter. The money was paid out of Father Prim's own funds, and he was subsequently reimbursed by the board of directors.

The next business relations with the plaintiff commenced in 1904, after the archbishop had assented to the building of a new church. Some time after May of that year plaintiff assisted Father Prim in procuring a site for a new building, which was purchased in July following.

Father Prim did not in the year 1904, or at any other time, make a verbal contract with the plaintiff as architect.

After August, 1904, Father Prim requested the plaintiff to make him a sketch of a new church, to be exhibited to the members of the congregation for the purpose of arousing their interest in the building of a new edifice.

Photographs of the sketches were made and placed in the church, with contribution boxes beneath. There they remained for about a year and a half, and the total contributions toward the erection of a new church amounted to $7. At that time the congregation had no money, and the idea of building another edifice was very unpopular. The congregation consisted of 4,300 members, and only 25 or 30 of them attended to listen to plaintiff's explanation of his sketches. While plaintiff told Father Prim what were the customary fees of architects, there was never any agreement to pay $7,500, or any other sum, for plaintiff's services, and there never was any definite understanding as to the cost of the building.

Father Prim, in January, 1907, did not instruct the plaintiff to go ahead with his plans, and told him on other occasions not to make final plans, because he did not wish to pay for them if the church was never built. In the interview of January 27, 1907, Father Prim informed the plaintiff that the archbishop was opposed to him, and that there were enormous difficulties in his way. After the decision of the board on January 29th, in favor of Mr. Brune, Father Prim went with the plaintiff to interview the archbishop, but the mind of that official had been made up. From the very beginning, Father Prim announced that the plaintiff was his choice as architect for the proposed new edifice, and furthered his pretensions in every way he could, in and out of the church. On January 29, 1907, Father Prim presented the plans of the plaintiff to the board of directors for consideration; but that body decided in favor of the plans of Mr. Brune, which were subsequently executed at an approximate cost of $50,000.

Under the charter of the defendant corporation, the board of directors is composed of the archbishop, the vicar general, the parish priest, and two laymen of the congregation.

The charter provides as follows:

"The said board of directors, named as aforesaid, and their respective successors in office, shall have power to transact all business of this corporation of whatsoever nature; but no debt exceeding $200 shall be contracted by this corporation without the consent of the archbishop or diocesan administrator."

The minutes of the board of directors show that from 1899 to May 1, 1904, no steps whatever were taken toward the building of a new church. On the latter date, a meeting was held which resulted in the board's authorizing Father Prim to sell certain lots and to use the proceeds in the purchase of other lots to be used as the site of the new church building. In July, 1904, the new site was purchased. On August 12, 1905, a meeting was held, at which there was a discussion as to architect fees, and Father Prim reported that one architect wanted 10 per cent. and another 5 per cent. The board unanimously

resolved that no higher percentage than 5 per cent. should ever be given to any architect. On April 3, 1906, the board met, and after stating that it was considered impossible to build a church costing $60,000 or $70,-000, and that the limit was $40.000, the board instructed Father Prim to make arrangements with the firm of Dibold & Owen to submit a sketch for a new church. This firm prepared a sketch, which was submitted to the board on January 29, 1907. Mr. Brune also prepared plans, which were submitted at the same meeting. Reading between the lines, it can be seen that the board opposed the payment of 10 per cent. architect fees to the plaintiff, and also opposed his plans calling for an expenditure of from $60,000 to $75,000. It further appears from the minutes that Father Prim throughout the whole transaction acted under the instructions of the board of directors. The minutes of May 1, 1904, contain the following recital:

"Father J. F. Prim stated then that, according to the charter of this congregation, no debts could be made without the consent of the board."

That Father Prim in 1902 or 1903 made any contract with the plaintiff, as alleged, is unreasonable and highly improbable in itself, and is flatly denied under oath by Father Prim. It was not until May, 1904, that any steps were taken to procure a site for the new church, and, therefore, there was no occasion for the selection of an architect in 1902 or 1903. The transactions between the plaintiff and Father Prim are readily explainable on the theory that they were warm personal friends, that the plaintiff was the personal choice of Father Prim for the position, and that Father Prim championed his pretensions in and out of the church. The exhibition and publication of the pictures and the posting of the large sign on the site were done for the purpose of advertising plaintiff as an architect, and commending him as the choice of the pastor.

The judge a quo, after hearing the witnesses, found that the plaintiff had failed to prove a contract either with the corporation or with Father Prim. We concur in that conclusion.

The law wisely requires that a contract for the payment of money above $500 must be proved at least by one credible witness and other corroborating circumstances. Civ. Code, art. 2227. There is no such preponderance of proof in favor of the plaintiff.

Plaintiff, like the other architects, took his chances of procuring the job from the board of directors. His statement that he was ignorant of the powers of the board, and that he believed that Father Prim had full authority as pastor to build the church, is an impeachment of his own intelligence.

Judgment affirmed.